United States District Court
Southern District of Texas
**ENTERED**
April 30, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| NAIKER ALVIAREZ, individually and on behalf of the Estate of Juan Fuenmayor, et al., <br><br> Plaintiffs, <br> v. <br> GOYA FOODS, INC., et al., <br><br> Defendants. | § § § § § § § § § § § § CIVIL ACTION NO. H-22-376 |

**MEMORANDUM AND OPINION**

An employee of Goya Foods, Inc. was operating a forklift within Goya's food-processing facility. The forklift struck an overhead pipe carrying hot water and beans. The contents were at a high temperature and under high pressure. The pipe broke when the forklift hit, spraying its contents onto the forklift operator. The employee died from severe burns. The employee's relatives sue Goya and several entities that allegedly had a role in determining the height of the overhead pipe. One of the defendants, Zachry Engineering, has moved for summary judgment on the ground that the undisputed facts show that it had no role in determining the height of the exposed overhead pipe or the suitability of the premises for forklift use. Zachry's motion for summary judgment is granted.

**I.     Background**

Goya Foods, Inc. is "the largest, Hispanic-owned food company in the United States." (Docket Entry No. 167-9 at 6). In March 2012, Goya announced plans to open a 350,000 square-foot food-processing facility in Brookshire, Texas. (Docket Entry No. 147-7). The facility was

designed to produce "more than 1,000 cans" of beans per minute with "ultra-modern processing equipment, [a] hydrostatic bean-cooker, and cannery operations." (Docket Entry No. 147-8 at 2).

In March 2012, Goya hired Ambitech Engineering Corporation—now called Zachry Engineering Corporation—"to provide engineering and project management services to design a new process kitchen and packaging area" for its Brookshire facility. (Docket Entry No. 147-3 at 1). More specifically, Ambitech was hired to "generate conceptual layouts for both the process and packaging areas and[,] with approval from Goya[,] [] generate and assist in releasing formal bid documents." (*Id.*).

In April 2012, Ambitech drew and submitted several piping and instrumentation diagrams to Goya for its review and comment. One of the diagrams Ambitech submitted showed a three-part structure for cooking refried beans. (Docket Entry No. 167-15 at 5). The structure included a hydraulic pump connected to a "blancher" by a 4-inch in diameter pipe. (Docket Entry No. 167-17 at 11–14, 16–17). The hydraulic pump sent beans and hot water through the pipe into the blancher, which would cook the beans. (*Id.* at 12–13). Ambitech's relationship with Goya ended in June 2012 after Goya failed to return comments on Ambitech's diagrams. (*Id.* at 10).

Goya's Brookshire facility was completed in 2014. (Docket Entry No. 147-8 at 2). Between 2017 and 2020, Goya doubled the size and production capacity of the facility. (Docket Entry Nos. 147-8 and 147-9). Ambitech had no role in either part of the construction.

In April 2021, Juan Jose Triana Fuenmayor was operating a forklift within the Brookshire facility when his forklift struck a pipe that was eight feet and four inches above the floor. (Docket Entry No. 167-1 at 7). The pipe parted at an elbow joint and blasted Mr. Fuenmayor with a mixture of beans and water that was 200 degrees and under pressure. He suffered severe burns over 95% of his body. (*Id.* at 12–13). Mr. Fuenmayor was transported to a hospital, where he received

treatment in the form of multiple "escharotomies"—incisions into the flesh to relieve "the pressure that gets created" from the burnt skin "becoming like a torniquet." (Docket Entry No. 167-2 at 9). Mr. Fuenmayor succumbed to his injuries six days later. (Docket Entry No. 167-1 at 13).

Mr. Fuenmayor's widow and the independent administrator of his estate, Naiker Jiminez Mariely Alviarez; Mr. Fuenmayor's minor son; and his mother, Magaly Valencia, bring this survival and wrongful death action against the following defendants: Goya; Key Technology, Inc.; Mectra S.p.A.; EMS Group, USA, LLC; Jacobs Engineering Group, Inc.; Apex Construction, Inc.; Ruby PR, LLC f/k/a Industrial Rubber and Mechanics; and Zachry Engineering Corporation f/k/a Ambitech. (Docket Entry No. 150 at 1). The plaintiffs allege that the defendants were negligent and grossly negligent because the pipe that Mr. Fuenmayor struck with the forklift "was located at an unsafe level above ground, was not guarded, and was not properly installed under the circumstances." (Docket Entry No. 150 at ¶ 21). The plaintiffs also allege claims for manufacturing and design defect. (*Id.* at ¶¶ 38–39, 56).

In January 2024, Zachry moved for summary judgment. (Docket Entry No. 147). The court denied the plaintiffs' motion to defer the submission date of Zachry's motion for summary judgment to allow the plaintiffs additional discovery. (Docket Entry Nos. 157, 163). The court noted that the plaintiffs had received written discovery answers from Zachry and had taken a Rule 30(b)(6) deposition of its corporate representative. The court ruled that the plaintiffs had failed to "specify the reasons for believing that specified facts probably exist, will be obtained in further discovery from parties other than Zachry, and will influence the outcome of Zachry's pending summary judgment motion." (Docket Entry No. 163 at 1).

In April 2024, the plaintiffs responded to Zachry's motion for summary judgment and objected to Zachry's summary judgment evidence. (Docket Entry No. 167). Zachry filed a reply,

3

along with its own objections to the plaintiffs' summary judgment evidence.  (Docket Entry Nos. 168, 169).  The plaintiffs filed a sur-reply without moving for leave to do so.  (Docket Entry No. 171).  Zachry moved to strike the sur-reply.  (Docket Entry No. 172).  The plaintiffs then moved for leave to supplement the summary judgment record with a supplemental report from their engineering expert.  (Docket Entry No. 173).  Zachry filed a response in opposition to the plaintiffs' motion to supplement, (Docket Entry No. 174), and the plaintiffs filed a reply.  (Docket Entry No. 175).  The plaintiffs also filed a reply in support of their objections to Zachry's summary judgment evidence.  (Docket Entry No. 176).

Based on the record, ample briefing, and applicable law, Zachry's motion for summary judgment is granted.  (Docket Entry No. 147).  The other pending motions—Zachry's objections to the plaintiffs' summary judgment evidence, (Docket Entry No. 169); Zachry's motion to strike the plaintiffs' sur-reply, (Docket Entry No. 172); and the plaintiffs' motion for leave to supplement the summary judgment record, (Docket Entry No. 173)—are denied as moot.  The reasons are set out below.

**II.     The Rule 56 Standard**

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence

"which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial." *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted). "However[,] the movant 'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). Of course, all reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022). But a nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

**III.    Analysis**

The grounds for the plaintiffs' negligence claims against Zachry are that Ambitech[1] failed to: (1) conduct a hazard assessment in connection with its work for Goya; (2) design the exposed overhead pipe connecting the hydraulic pump and blancher at a safe elevation; and (3) warn Goya that the pipe, if installed too low, would be a safety hazard. (Docket Entry No. 167 at 26–27). Zachry argues that summary judgment is appropriate because none of these alleged failures was within the scope of the project Goya hired Ambitech to do. According to Zachry, "other entities conducted the engineering and construction that led to the placement of the incident pipe." (Docket Entry No. 147 at 5).

The court is persuaded that summary judgment is appropriate. Before setting out the reasons for this ruling, the court addresses the plaintiffs' objections to Zachry's summary judgment evidence. (Docket Entry No. 167). The court denies as moot the plaintiffs' motion to supplement the summary judgment record because, even assuming the supplemental evidence is properly before the court, summary judgment is appropriate. (Docket Entry No. 173). The court also denies as moot Zachry's objections to the plaintiffs' summary judgment evidence because the evidence to which Zachry objects fails to create any fact issue precluding summary judgment. (Docket Entry No. 169).

**A.    The Plaintiffs' Evidentiary Objections**

The plaintiffs object to several paragraphs of the declaration of Zachry's corporate representative, Philippa Coates, who worked as Ambitech's "Senior Project Manager for project execution and Director for the business development segment for Food and Beverage." (Docket Entry No. 147-2 at ¶ 3). With one exception, the objections are overruled.

---

[1]  Because Zachry was called "Ambitech" at the time of the events underlying this case, the court refers to the defendant as "Ambitech."

The plaintiffs object to paragraph 9 of Ms. Coates's declaration on the ground that her statement about the scope of Ambitech's project for Goya contradicts the project-defining document. (Docket Entry No. 167 at 18). The plaintiffs argue that while Ms. Coates states in her declaration that Zachry's "planned project objective was to provide preliminary engineering and project management services," the project-defining document does not contain the word "preliminary." (*Id.* at 18–19). The plaintiffs also argue that Ms. Coates's use of the word "preliminary" in paragraph 9 contradicts paragraph 8 of her declaration, in which she states that Zachry was hired "to perform professional engineering services for the Goya facility." (*Id.* at 19).

This objection is overruled. Ms. Coates's statement does not contradict the project-defining document or other statements in her declaration. The project-defining document supports the characterization of Ambitech's work as "preliminary" because the document states that Ambitech would "generate conceptual layouts" that other entities would use for construction. (Docket Entry No. 147-3 at 1). And even if Ms. Coates's statement did contradict the project-defining document or other statements in her declaration, this would not support excluding the statement from evidence. *Baskin v. EK Real Estate Services of NY, LLC*, No. 421CV00727SDJCAN, 2022 WL 17731822, at *2 n.5 (E.D. Tex. Sept. 13, 2022) ("To the extent Plaintiff asserts statements in the Kessler or Feierstein declaration have been controverted or contradicted by other evidence, such contention goes to the weight not the admissibility of the evidence.").

The plaintiffs also object to paragraphs 11–15 of Ms. Coates's declaration on the ground that they contradict statements in the project-defining document. (Docket Entry No. 167 at 19). The plaintiffs do not explain how statements in these paragraphs contradict the project-defining

7

document, or why the remedy is exclusion. *See Baskin*, 2022 WL 17731822, at *2 n.5. The objection is overruled.

The plaintiffs object to paragraphs 17–19 and 27 of Ms. Coates's declaration on the ground that they constitute expert opinions, and Ms. Coates has not been designated as an expert. (Docket Entry No. 167 at 19). The objections are overruled. Paragraphs 17 and 18 make factual assertions that Ambitech's work product for Goya was variously marked "NOT FOR CONSTRUCTION," "ISSUED FOR DESIGN," "FOR APPROVAL," OR "ISSUED FOR BID." (Docket Entry No. 147-2 at ¶¶ 17–18). Paragraph 19 states that "Ambitech did not expect or intend that its work product, such as it was, would ever be used for construction." (*Id.* at ¶ 19). This is a permissible opinion for a lay witness who, like Ms. Coates, has personal knowledge of the meaning of the notations on Ambitech's work product. *See* FED. R. EVID. 701. Paragraph 27 states that these notations are "typical notations made by engineers to notify persons who may view them of the appropriate and limited use of the documents based on their level of completion." (Docket Entry No. 147-2 at ¶ 27). This opinion is also permissible for a lay witness who, like Ms. Coates, has worked for decades as an engineer. (*Id.* at ¶ 5). *See Mississippi Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (holding that a lay witness can "express an opinion even on matters appropriate for expert testimony" if the witness has knowledge of the facts underlying the opinion and the opinion has a rational connection to those facts).

The plaintiffs object to paragraph 20 of Ms. Coates's declaration on the ground that her statement that "the suggested layouts in the Ambitech drawings are different from what appears to be the as-built construction" contradicts her prior deposition testimony that the pump-pipe-blancher design was built according to Ambitech's drawings. (Docket Entry No. 167 at 19–20). The plaintiffs also object that the statement is irrelevant. (*Id.*). The objections are overruled. Ms.

8

Coates's declaration statement that Goya did not follow "the suggested layouts" in the drawings is too general for the court to conclude that the statement contradicts her deposition testimony. For example, it may be that the pump-pipe-blancher design did not change, but something else did. The sham-affidavit doctrine does not apply without a "clear contradiction on a material point." *Tafacory v. Deutsche Bank Nat'l Tr. Co.*, 2020 WL 7658070, at *6 (E.D. Tex. Nov. 6, 2020), *report and recommendation adopted sub nom. Tafacory v. Deutsche Bank Nat'l Tr. Co. as Tr. for Registered Holders of Long Beach Mortgage Loan Tr. 2006-6, Asset-backed Certificates, Series 2006-6*, 2021 WL 958544 (E.D. Tex. Mar. 15, 2021), *aff'd*, 2021 WL 6061556 (5th Cir. Dec. 17, 2021). There is no clear contradiction that requires exclusion of the statement.

The plaintiffs object to paragraphs 22–25 of Ms. Coates's declaration on the ground that it is not based on personal knowledge and contradicts her prior deposition testimony. These paragraphs state that Ambitech did not complete its intended scope of work for Goya because Goya did not return comments on its diagrams, and that Ambitech had no role in "final pipe designs[] or as-built height or location of the incident pipe." (Docket Entry No. 147-2 at ¶¶ 22–25). The plaintiffs argue that these statements are not based on personal knowledge because, when discussing the termination of Ambitech's relationship with Goya in her deposition, Ms. Coates stated: "*I think* we agreed that our work processes were sufficiently different and we mutually agreed to conclude the project when they issued the [diagrams] for approval and we did not get comments back." (Docket Entry No. 167 at 20) (emphasis added). The plaintiffs argue that Ms. Coates's declaration statements contradict her prior deposition testimony because, in her deposition, she stated that Zachry never told Goya that it "was withdrawing any of its work product or advising Goya not to use any of it in any way." (*Id.* at 21).

9

These objections are overruled. That Ms. Coates prefaced her deposition answer with "I think" does not establish that she lacks personal knowledge on the subject. Her declaration supports a finding of personal knowledge because she states she "was involved with the project made the basis of the Lawsuit." (Docket Entry No. 147-2 at ¶ 7). Further, her declaration statements do not contradict her deposition testimony. The reason for the termination of Ambitech's relationship with Goya is separate from whether Ambitech "withdrew" its work product or advised Goya not to use it.

The plaintiffs object to paragraphs 29–31 of Ms. Coates's declaration on the ground that they are expert opinions, and Ms. Coates is not designated as an expert. (Docket Entry No. 167 at 21). In these paragraphs, Ms. Coates opines, based on her experience as an engineer, that: (1) no reasonable engineer would rely on the documents Ambitech submitted to Goya to construct a facility like Goya's food processing facility; (2) no reasonable engineer could foresee that drawings like Ambitech's would be used to construct a facility like Goya's; and (3) "it would be impossible to complete the construction or installation of the incident pipe based on the drawings using Ambitech's work product because they do not address location, height, or final configuration of the piping." (Docket Entry No. 147-2 at ¶¶ 29–31). The plaintiffs' objection is sustained and these paragraphs are stricken. What a reasonable engineer would do or foresee, and whether Goya's facility could hypothetically be constructed based on Ambitech's work product, are issues requiring specialized knowledge under Federal Rule of Evidence 702. Ms. Coates cannot offer these opinions without being designated as an expert under Rule 26(a)(2).

B.     **The Motion for Summary Judgment**

Zachry argues that the plaintiffs have failed to raise genuine factual disputes material to determining the elements of the plaintiffs' negligence claim: (1) duty, (2) breach, and (3) proximate

10

causation. Zachry also argues that the plaintiffs have failed to raise a genuine factual dispute material to determining whether Ambitech was grossly negligent. The court rules that the plaintiffs have failed to raise a genuine factual dispute material to determining the threshold requirement that Ambitech owed a duty to Goya that it breached. The court does not analyze the other negligence elements or whether the plaintiffs have satisfied the higher burden of raising a factual dispute as to gross negligence. The reasons are set out below.

The existence of a legal duty is the "threshold inquiry in a negligence case." *Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 582 (Tex. 2023) (quoting reference omitted). "Whether a legal duty exists under particular facts, and if so, the scope and elements of that duty, present questions of law that courts must decide." *Id.* Under Texas law, the duty analysis proceeds in two steps. First, the court asks whether the Texas Supreme Court has "previously held that a duty does or does not exist under the same or similar circumstances." *Id.* If, for example, the Texas Supreme Court has previously recognized that the parties' relationship is a "special relationship" giving rise to a legal duty, "the duty analysis ends there" because the duty exists in the case presented as a matter of law. *Id.* Second, if no duty has previously been recognized in the same or similar circumstances, the question is whether a duty should be recognized. *Id.*

In determining whether a duty not previously recognized should be recognized, courts weigh "the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Id.* (cleaned up). Courts also consider "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm." *Id.* (quoting reference omitted).

11

Under Texas law, "[a] contract for professional services gives rise to a duty by the professional to exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 594 (Tex. App.—Fort Worth 2008, pet. denied) (citation omitted). "An engineer . . . must use the skill and care in the performance of his duties commensurate with the requirements of his profession and is only liable for a failure to exercise reasonable care and skill commensurate with those requirements." *Id.* (citation omitted).

An engineer's duty "depends on the particular agreement entered into with his employer." *Id.* (citing *I.O.I. Sys. Inc. v. City of Cleveland, Tex.*, 615 S.W.2d 786, 790 (Tex. App.—Houston [1st Dist.] 1980 writ ref'd n.r.e.)). An engineering contract cannot create a duty of care with respect to work that was not within the scope of the engineer's contractual promises or undertakings. *See id.*

*Dukes* illustrates this principle. The plaintiffs in that case sued on behalf of individuals who had drowned in an outdoor water sculpture in the City of Fort Worth. *Id.* at 590. The plaintiffs sued the City and several architects and engineers who had provided services to the City in connection with the water sculpture. *Id.* Some of the architects and engineers argued that they owed no duty of care to the decedents. The plaintiffs responded that these engineers and architects owed a duty to the decedents based on the entities' contracts with the City. *Id.* at 594–95. The court found that the contracts did not give rise to a duty of care owed to the decedents because the contracts "did not require [the architects and engineers] to address safety issues." *Id.* at 595. Rather, the architects and engineers' duties under the contracts were to provide "a review of existing conditions," a review for ADA compliance, and development of "appropriate repair options and establishing of repair priorities." *Id.* Another architect's contractual obligations were

12

to "act as a consultant . . . to provide a review and assessment of the" water sculpture, and to "do a limited visual inspection . . . to document the existing conditions as it related to repair and restoration of the site to its original condition, along with possible ADA issues." *Id.* Because the contracts did not obligate the architects and engineers to conduct a safety review or report or fix any safety hazards, the court concluded that they owed no duty to the decedents. *Id.*

Following this precedent, the question is whether Ambitech's allegedly negligent acts correspond to the promises and undertakings Ambitech made in its contract with Goya. Did the scope of Ambitech's contractual obligations encompass: (1) assessing and warning of potential hazards arising from the implementation of Ambitech's diagrams; and (2) specifying a safe height for the pipe connecting the hydraulic pump and blancher shown in Ambitech's diagrams?

The project-defining document identifies two general obligations undertaken by Ambitech:

> [1] Ambitech will generate conceptual layouts for both the process and packaging areas and [2] with approval from Goya will generate and assist in releasing formal bid documents.

(Docket Entry No. 147-3 at 1). Although Ambitech did not contract to construct the facility for Goya, it did contract to "follow up with a construction manager during the installation of the process kitchen and packaging equipment through startup." (*Id.*). Ambitech's construction manager was to "provide on-site construction management services during the installation of the project for a period of 20 weeks . . . ." (*Id.* at 8).

The project-defining document also stated that:

> Ambitech will develop process specifications for the equipment for the process kitchen. The specifications will be written by Ambitech and reviewed by Goya prior to release to third party bidders. The specifications will include Goya specific requirements to meet the requirements for the listed bean and salsa products as well as general cGMP specifications for the food industry. Upon the receipt of bids, high level bid reviews / quote review will be prepared for Goya's review where sole source equipment has not already been pre-selected. The Master plan delineates the anticipated vendors. Ambitech will assist and help define the "best" equipment to achieve the best working solution for the process kitchen.

13

(*Id.* at 3).

Neither the project-defining document nor other record evidence supports finding that Ambitech contracted to assess and warn Goya of potential hazards arising from the construction following the "process specifications" for the "equipment of the process kitchen," specifications that Ambitech was to write and Goya was to review. The term "process specifications" is not defined. The record does not show that Ambitech's "process specifications" for the process kitchen equipment included specifying a safe height above the floor for the pipe to be installed. There is no record evidence that Ambitech breached its obligation to help Goya "define the best equipment to achieve the best working solution for the process kitchen," (*id.*), or that the obligation included the duty to ensure that the overhead piping acquired from a third party vendor was actually installed in a safe position with sufficient clearance for vehicles operating or equipment installed on the floor. The uncontroverted evidence establishes that Ambitech's relationship with Goya dissolved before the construction phase began.

The obligation undertaken by Ambitech to "generate conceptual layouts" cannot fairly be read to encompass a broad obligation to warn of every potential hazard that could arise if particular pieces of equipment were situated in particular places in Goya's facility. The outcome would be different if Ambitech's diagram for the pump-pipe-blancher mechanism specified an unsafe height for the pipe, but the diagram specified no height at all. And that makes sense because Ambitech's role was to diagram equipment and its conceptual relationship to other stationary equipment, not to recommend that the equipment be installed in particular physical spaces in Goya's facility. That job was contemplated to take place under a separate contract and by a separate entity. (Docket Entry No. 147-2 at ¶ 11). Accordingly, Ambitech marked all of its work product for Goya as "NOT FOR CONSTRUCTION." (*Id.* at ¶ 17). And Ambitech marked its drawings as either "ISSUED FOR DESIGN," "FOR APPROVAL," or "ISSUED FOR BID." (*Id.*).

14

The contrary opinions of the plaintiffs' engineering expert, Gregg S. Perkins, fail to raise a material factual dispute. Mr. Perkins opines that:

- "[T]he height/location of the Incident Piping was a foreseeable hazard that Ambitech knew or should have known about during its work at/for Goya's Facility. As such, Ambitech was developing P&IDs for the Goya's Plant [*sic*] and would have the necessary personnel at Goya's Facility to ensure that all Piping and Equipment were safely and properly designed and installed." (Docket Entry No. 167-1 at 14).

- "Ambitech . . . should have provided responsible and competent Engineering Services, including any mandatory technical information pertaining to the location, installation, plumbing, and support of the Piping throughout Goya's Facility. As such, Ambitech . . . should have directed and consulted with Goya throughout the construction and installation of Goya's Facility, which included the installation and hook-up of . . . Ambitech's process design documentation and P&IDs." (*Id.* at 15).

- "Absent warnings and information with regard to the design, installation, application, including and [*sic*] any hazards associated with the low Incident Piping, Ambitech . . . failed to inform, caution, notify, alert, and advise an ordinary User of the hazards associated with a low piping runs that would be transferring liquids, steam, and product under pressure and at high temperatures." (*Id.* at 16).

- "The height at which any piping and/or apparatuses that needed to be plumbed in, i.e., hooked-up, to other equipment was designed and/or known to Ambitech . . . . Knowing this, Ambitech . . . should have ensured that an ordinary and expected User, i.e., Goya, of their equipment and Systems Layout, were knowledgeable and aware of the low piping, i.e., Incident Piping, which was positioned at heights where personnel and/or

> operating equipment could come into contact with it during normal operating conditions. . . . In my opinion, Ambitech[] . . . failed to exercise reasonable care in carrying out its engineering responsibilities to design and analyze a system that was safe and could be operated and protected under normal conditions/operations being conducted at Goya's Facility." (*Id.*).

Mr. Perkins's supplemental report—which is the subject of the plaintiffs' motion for leave to supplement the summary judgment record, (Docket Entry No. 173)—contains these additional opinions:

> In my professional opinion, with Zachry's P&IDs being Issued for Approval, it should have been foreseeable to Zachry that Goya was to utilize these P&IDs during the design and construction of its Brookshire, Texas Facility. Moreover, Zachry knew Forklifts were to be used at Goya's Facility. In this regard, Zachry, as a competent engineering firm, the designer of the Conceptual Layout of Goya's Facility/equipment, and the creator of these P&IDs/PFDs, knew and should have communicated to Goya regarding any interconnecting piping, its necessary safe elevations above the Floor, and the potential hazards it created if the interconnecting piping was not properly positioned and/or protected; which in my professional opinion, Zachry failed to identify and/or communicate to Goya which ultimately allowed for the Incident Pipe to be constructed at an unsafe and precarious position above the ground and for these operations at Goya's Facility.

(Docket Entry No. 173-1 at 32–33).

Mr. Perkins's opinion that Ambitech should have specified a safe height for the pipe or warned Goya of the hazards of installing the pipe too low amounts to an opinion that Ambitech should have done something that was beyond the scope of its obligations under the contract with Goya. The scope of Ambitech's contractual duty is a question of law for the court, and Mr. Perkins's opinion fails to raise a genuine factual dispute material to resolving that question of law.

Mr. Perkins's opinion that Ambitech would—not merely should—have had personnel at Goya's facility during the installation process to ensure that the pipe was installed at a safe height is not supported by record evidence. The uncontroverted evidence establishes that Ambitech

16

ceased performing work for Goya in June 2012, before the construction of the facility began, because Goya failed to return comments on Ambitech's diagrams.

Mr. Perkins's opinion that "[t]he height at which any piping . . . needed to be plumbed in . . . to other equipment was designed and/or known to Ambitech" is also not supported by record evidence. Ambitech's diagram of the pump-pipe-blancher mechanism did not specify a height for the pipe, and the record does not support an inference that Ambitech knew the height at which Goya would install the pipe.

Finally, Mr. Perkins's opinion that it was foreseeable to Ambitech that Goya would use its diagrams "during the design and construction" of the facility is immaterial. Ambitech's diagrams were not drawn for construction purposes, so they did not specify construction details like the installation height of the pipe. (Docket Entry No. 147-2 at ¶¶ 10–11). Ambitech had no duty—beyond labeling the diagrams "ISSUED FOR DESIGN" or "NOT FOR CONSTRUCTION"—to foresee and forestall hazards that might result from Goya's misuse of design drawings for construction purposes.

In addition to arguing for the existence of a duty based on Ambitech's contract with Goya, the plaintiffs also argue for the recognition of a duty based on weighing "the risk, foreseeability, and likelihood of injury against the social utility of [Ambitech]'s conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on [] [Ambitech]." (Docket Entry No. 167 at 22–26). The court doubts that these factors could give rise to a duty that extends beyond the scope of Ambitech's contractual obligations to Goya. But even if the factors could support a duty that the contract does not, the factors do not support a duty here that Ambitech breached. It would not be reasonable to place on Ambitech—which was hired to provide preliminary design diagrams—the duty of detecting and warning of future potential

17

hazards that might materialize in the construction and installation phase. That duty appropriately rests with the entities hired by Goya to construct the facility and implement Ambitech's designs—the entities which presumably determined the height at which the pipe was installed.

## IV.   Conclusion

Zachry's motion for summary judgment is granted. (Docket Entry No. 147). The other pending motions—Zachry's objections to the plaintiffs' summary judgment evidence, (Docket Entry No. 169); Zachry's motion to strike the plaintiffs' sur-reply, (Docket Entry No. 172); and the plaintiffs' motion for leave to supplement the summary judgment record, (Docket Entry No. 173)—are denied as moot.

SIGNED on April 30, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge